642 So.2d 1328 (1994)
Sylvia Hortense PAYTON
v.
STATE of Mississippi.
No. 91-KA-00677.
Supreme Court of Mississippi.
September 8, 1994.
*1329 Mack A. Bethea, Gulfport, for appellant.
Michael C. Moore, Atty. Gen. and Jean Smith Vaughan, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PRATHER, P.J., and BANKS and SMITH, JJ.
SMITH, Justice, for the Court:
Sylvia Hortense Payton appeals from her conviction in the Circuit Court of Harrison County on charges of felony child abuse. Before this Court Payton presents seven assignments of error, the majority of which are clearly without merit. We address two issues:
A. THE COURT ERRED IN FAILING TO GRANT THE APPELLANT'S MOTION FOR A DIRECTED VERDICT AT THE CLOSE OF THE STATE'S CASE, OR IN FAILING TO GRANT THE MOTION FOR A DIRECTED VERDICT WHICH WAS RENEWED AT THE CLOSE OF THE CASE AND RAISED BY JURY INSTRUCTION D-1, WHICH WAS A REQUESTED PREEMPTORY [sic] INSTRUCTION, BECAUSE NO EVIDENCE WAS BEFORE THE COURT THAT THE DEFENDANT FELONIOUSLY ABUSED A CHILD, SAID EVIDENCE REQUIRED UNDER MISS.CODE ANNOTATED, SECTION 97-5-39(2), CODE OF 1972.
B. THE LOWER COURT ERRED IN NOT ALLOWING JURY INSTRUCTIONS D-4 AND D-5, LESSER INCLUDED OFFENSE INSTRUCTIONS, CONCERNING MISDEMEANOR CHILD ABUSE UNDER 97-5-39(1) AND IN DENYING THE DEFENDANT THE OPPORTUNITY TO OFFER AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF SIMPLE ASSAULT AS DEFINED IN MISS.CODE ANNOTATED, SECTION 97-3-7(1).
Upon careful consideration we find no reversible error exists and therefore affirm the conviction and sentence of Payton to fifteen (15) years in the custody of the Mississippi Department of Corrections, with five (5) years suspended.

*1330 THE FACTS

On October 2, 1989, Richard Chapman, a lieutenant paramedic with the Gulfport Fire Department, was dispatched to the Gulf Mist Apartment complex in response to a call of a child bleeding and possible poisoning. The paramedics found Sylvia Payton standing outside, holding her crying baby. She told them the baby had swallowed glass.
Payton told the paramedics she had fed her and there was glass in the formula. She said the baby had been vomiting and passing blood. An examination indicated there was fresh blood coming from the rectum. Chapman stated Payton produced a plate of formula and a baby bottle, both of which contained visible shards of glass. Chapman stated the child otherwise appeared to be a "normal healthy child."
Detectives Eric Hollman and Stanley Vance, investigators with the Gulfport Police Department, were also dispatched to the Payton residence. Hollman spoke with Payton, who informed him she had bought the baby food the previous Friday and opened it on Sunday. Payton did not indicate how the glass got into the baby food. Vance stated that after the baby was taken to the hospital, an investigation began because it was thought a food tampering may have occurred. The FDA was contacted. No cereal boxes matching the lot number of the box Payton had were found at the stores closest to Payton's apartment.
The search was expanded and one matching box was found at the Sack and Save on Pass Road. Upon a search of Payton's apartment, another officer, Cook, found a broken window in a bedroom and fresh glass fragments on the window sill and carpet below. In another bedroom the officers discovered a meat mallet on top of a dresser. There were glass fragments on the dresser and "little indentations" which "looked like the meat tenderizer was used to beat on top of the dresser." Upon closer examination, the meat mallet was also found to have glass fragments stuck in it.
Dr. Philip J. Starceski testified he was a pediatrics resident who saw the baby, Veouis Nicole Payton, upon her admission to the hospital at Keesler Air Force Base on October 2, 1989. Dr. Starceski received the infant's history from the emergency room noting that the child had blood streaked vomit and a dark bowel movement. The mother had noted glass fragments in the baby's cereal and was concerned that the cause of the blood was due to swallowing glass.
A physical examination revealed the following: the palate, or roof of the mouth was scratched, but the back of the throat was normal; there was no visible blood within the stomach contents, but a chemical analysis showed very faint traces of blood in the stomach; the stool was "strongly positive" for blood; and a rectal exam indicated a tiny tear, but no blood, in the outer area. The baby's blood pressure was also high, but this was considered normal for this infant because she was treated previously for high blood pressure.
Laboratory tests on the stool for blood ranged from "one plus" to "four plus." No glass fragments were visually detected in the stool samples. Dr. Starceski opined that the scratches on the palate were in a position consistent with those of a baby drinking liquid through a nipple that contained glass. Dr. Starceski was of the opinion that "with the history of having ingested glass fragments," it was most probable that the abrasions on the palate were due to glass fragments.
Dr. Starceski stated the baby had been treated previously for blood in the stool, but scratches of the palate had not been observed. During a previous hospitalization in August 1989, for blood-streaked vomit and stool, the baby was diagnosed with a prolapse of part of the stomach into the esophagus.
Detective Jeffrey Michel first interviewed Payton at the hospital on October 2. Payton told him she purchased the baby food in question at the Sav-A-Center on September 29, and fed it to the baby beginning on October 1. Payton stated on October 2 she spilled the food and, while cleaning it up, noticed it had glass particles in it.
In interviewing Payton, Michel began to notice inconsistencies in Payton's version of the incident. Detective Payne asked Payton *1331 whether she had observed a black male, wearing a black trench coat, who walked with a limp and had a gold tooth in the aisle near the baby food when she purchased the cereal. After Payton stated she had observed this person, she was advised of her Miranda rights. Michel stated the other officers stepped outside the room at one point and he "leaned over and said, Ms. Payton, why don't you go ahead and tell us the truth on how the glass got into the baby box," and Payton stopped crying and "just said okay, I put the glass in the box."
The other officers returned and Payton explained that on the 29th she received a call from her boyfriend, Terry Page, who was stationed with the Navy in Virginia. Page told Payton he was seeing another woman and she was pregnant. Michel stated Payton was "very upset" about this, really mad at Page and "wanted some way to get him down here so she could talk to him in person." Payton thought she could do this through the Red Cross for some type of medical emergency. She took vise grips and broke up some glass in her bedroom, took a meat cleaver and broke it up more, then placed several particles in the baby food and a "pinch" in the bottle. Payton stated she fed this to the baby on Sunday morning and night. She then purposely spilled the cereal and reported it to the police.
Chief Investigator Wayne Payne stated he had made up the description of a black man in the baby food aisle of the Sav-A-Center, whom Payton agreed she had seen when purchasing the baby food. Payne stated officers found neither vise grips nor a towel at Payton's apartment. No one told Payton if she would tell the officers what they wanted to hear, she could go home.
Terry Page, the baby's father, was not aware of any problems with the baby's digestive tract but had been contacted by the Red Cross and came back to Gulfport in August 1989 when the baby was hospitalized. Page stated when he called Payton a few days before the incident, they had discussed his seeing another woman, who might be pregnant. Page stated he told Payton, "Well, I might have to cut Veouis' money off." But he then told her he "would never do that to my little girl." Page stated Payton did not seem upset about the other woman, and that the two had talked about the other woman before.
Mrs. Osie Payton, Sylvia Payton's mother, testified that Sylvia instructed her not to feed the baby any cereal during an overnight visit the weekend prior to the incident. Mrs. Payton specifically recalled that it was she who told her daughter not to feed the baby any cereal, but only juice instead.
Sylvia Payton testified that on October 30, she borrowed a neighbor's vacuum cleaner to clean for an upcoming inspection. Afterwards, she emptied the vacuum bag into a plastic container and set it on her kitchen counter. She noticed she had picked up "large chunks" of glass from the back bedroom, which she had not seen while vacuuming. She threw the container of vacuumed contents into the dumpster and began preparing a baby bag for her daughter. Payton stated: "I got ready to pack her bag and I reached for her cereal on the top of the counter, and as I was reaching it tipped over and it all come spilling on the counter top." She then "raked it back in the box," and put the box in the baby bag.
Payton testified that she did not prepare any bottles with this box of cereal which had been spilled. She further stated that when she went to her mother's home that same evening for an overnight visit, she instructed her mother not to feed the baby any cereal at all.
Payton stated that she returned home from her mother's house on October 2 and that it was then that she first noticed the glass fragments in the cereal as she prepared to feed the baby. She and a neighbor examined the cereal and decided to call paramedics. According to Payton, she later spoke with the emergency room attendants and told them "I got ready to feed her the cereal, and before I fed her the cereal I noticed glass fragments and after that I got ready to change her Pamper. That's when I noticed the blood streak that was in her Pamper."
At the police station she answered a lot of questions about how the glass got into the cereal. Asked if she fed the baby any glass *1332 she stated, "no, she ... shouldn't have no glass [in] her system whatsoever, because I didn't feed her any." During the interview, Payton stated she repeatedly told the investigators she did not feed the baby glass, but they kept going "on and on." The men told her they did not believe her. When she and Detective Michel were alone at one point, he stated she might as well tell them who did it and then they could all go home. Payton stated, "That's when I confessed to doing it." Payton stated she became very angry because she felt Michel had tricked her into confessing that she had fed "a little pinch" to the baby even though she had been saying she had not. Payton stated she had never fed her baby any glass.
Payton stated when the baby was hospitalized in August 1989, she called Page and he advised her the only way he could come home was if the Red Cross contacted his superior and he was given permission to leave. Payton stated the news about the other woman did not bother her, but it upset her very much that she might lose their baby's child support. She stated the investigators who interviewed her led her, after they got her to admit she had "done it," to say that the reason was to get Page to come back to Gulfport. She admitted she told the police these things, even though they were not the truth. Payton admitted she took glass off the floor near the broken window in her apartment. She placed it in a towel and beat it to break it up. She denied using either vise grips or a "meat cleaver" to do this. She then threw the towel, with the glass still inside it, into the bathroom. She stated the glass was still in large pieces, not fine fragments at the time. Payton stated she did not really know why she was breaking up the glass because she "wasn't [herself] at the time."
Payton denied telling anyone at the scene or the hospital that the baby had vomited blood. She denied telling anyone the glass was in the cereal when she bought it. Payton stated she admitted feeding the baby glass, but not to putting the glass into the bottle.

DISCUSSION

A. THE COURT ERRED IN FAILING TO GRANT THE APPELLANT'S MOTION FOR A DIRECTED VERDICT AT THE CLOSE OF THE STATE'S CASE, OR IN FAILING TO GRANT THE MOTION FOR A DIRECTED VERDICT WHICH WAS RENEWED AT THE CLOSE OF THE CASE AND RAISED BY JURY INSTRUCTION D-1 WHICH WAS A REQUESTED PREEMPTORY [SIC] INSTRUCTION BECAUSE NO EVIDENCE WAS BEFORE THE COURT THAT THE DEFENDANT FELONIOUSLY ABUSED A CHILD, SAID EVIDENCE REQUIRED UNDER MISS CODE ANNOTATED, SECTION 97-5-39(2), CODE OF 1972.
Payton was convicted of felonious child abuse as provided by Miss. Code Ann. § 97-5-39(2):
(2) Any person who shall intentionally (a) burn any child, (3) torture any child or, (3) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child and, upon conviction, may be punished by imprisonment in the penitentiary for not more than twenty (20) years.
Payton argues the trial court erred in refusing her requested peremptory instruction D-1 and in denying her subsequent motions for a directed verdict. This Court has noted that in "requesting a peremptory instruction, a party is essentially asking for a directed verdict." Butler v. State, 544 So.2d 816, 819 (Miss. 1989). Further, this Court has frequently set forth the standard of review to be used on motions for a directed verdict:
In passing upon a motion for directed verdict, all evidence introduced by the State is accepted as true, together with any reasonable inferences that may be drawn from that evidence, and, if there is sufficient evidence to support a verdict of guilty, the motion for directed verdict must be overruled.
Id. at 819; Guilbeau v. State, 502 So.2d 639, 641 (Miss. 1987).
*1333 Counsel for Payton contends the State failed to present evidence that the baby suffered serious bodily harm. More specifically, Payton argues testimony from Dr. Starceski, the baby's treating physician on this occasion and since her premature birth, failed to show the baby had ever ingested glass at all.
Accepting the State's evidence as true, and also considering any reasonable inferences therefrom, the jury heard Payton testify that she took pieces of glass from a bedroom in her apartment, placed them in a towel and broke them into smaller pieces. Asked why she was breaking up this glass Payton answered, "It was attention at first, it was attention at first, but then I said, no, I wasn't going to do it, I wasn't going to hurt myself just because of something he had done." She further stated, "nothing really, to do nothing with it, because I see wasn't no use for me. Who was I going to hurt, myself or who... ." She stated she did not know what happened to the glass after this, because she lay down and went to sleep. The jury could reasonably have inferred that Payton decided to harm the baby after abandoning the idea of hurting herself with the glass.
Payton admitted at trial that she had confessed to feeding her baby glass:
Q: Now, Sylvia, did you confess to doing it? What do you mean? You confessed to putting glass in the container?
A: No. Feeding it to her.
Q: When did you confess to feeding it to her?
A: After the tape was cut off and Detective said you tell us who did it.
The jury was free to believe that Payton's confession that she had fed a "little pinch" of glass to her baby in an effort to get her boyfriend to return to Gulfport on emergency leave was the truth.
Further, Paramedic Chapman stated upon arrival at Payton's apartment, Payton told him she had fed the baby and it had swallowed glass. His examination on the scene revealed bleeding around the baby's rectum. Dr. Starceski testified the results of his physical examination of the baby were consistent with the report of the baby swallowing glass fragments. He observed that the scratches to the baby's soft palate, or back of the roof of the mouth, were in a location consistent with those of a baby feeding through a bottle. The doctor disagreed that scratches of the soft palate are common in infants; he specifically stated they were uncommon since a person would practically have to gag himself to reach that area of the mouth. Further, faint traces of blood were detected in the baby's stomach and her stool was "strongly positive" for blood.
The jury could also consider the physical evidence including a baby bottle, its contents, including both glass and formula, and a meat mallet containing shards of embedded glass. The jury was properly instructed on the elements the State was required to prove by Instruction C-25, which essentially tracked the language of Miss. Code Ann. § 97-5-39. It was properly left to the jury to decide whether the State had proved both that Payton intentionally fed broken glass to her baby, and second, whether this was done in "such a matter as to cause seriously bodily harm." A review of all the evidence indicates the jury's finding that the State proved each element of the offense was supported. It must be recalled that we are here dealing with a victim who was an infant child, only eight months old at the time of the incident. It cannot be seriously contended that the feeding of glass to this child in the manner charged was not an act done "in such a manner as to cause seriously bodily harm."
We are of the opinion that merely placing glass in the child's formula and feeding it to her in this manner indicated an intent to cause serious bodily harm. The jury heard from Payton herself that she did confess to investigators that she had fed broken glass to her baby, and her reason for doing so. As to whether serious bodily harm resulted, the jury may properly have determined that evidence that the roof of the baby's mouth showed abrasions, and evidence of internal bleeding, including that the rectum was bleeding upon the paramedics' initial examination, the stomach contents showed traces of blood, and the stool was strongly positive for blood, was sufficient proof on this element.
*1334 The motion for directed verdict was properly denied. This assignment of error is without merit.

B. THE LOWER COURT ERRED IN NOT ALLOWING JURY INSTRUCTIONS D-4 AND D-5, LESSER INCLUDED OFFENSE INSTRUCTIONS, CONCERNING MISDEMEANOR CHILD ABUSE UNDER 97-5-39(1) AND IN DENYING THE DEFENDANT THE OPPORTUNITY TO OFFER AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF SIMPLE ASSAULT AS DEFINED IN MISS.CODE ANNOTATED, Section 97-3-7(1).
The jury in the case sub judice was instructed that it could either find Payton "guilty" or "not guilty" of the crime of felonious child abuse. Payton here argues the jury should have also been instructed on and allowed to consider the "lesser included offenses" of misdemeanor child abuse and simple assault.
The initial determination for this Court is whether either or both of these offense can properly be deemed "lesser included offenses" of the crime for which Payton was indicted. As was stated in Porter v. State, 616 So.2d 899, 909-10 (Miss. 1993) (Hawkins, C.J., specially concurring):
A lesser included offense by definition is one in which all its essential ingredients are contained in the offense for which the accused is indicted, but not all of the essential ingredients of the indicted offense. An accused could not be guilty of the offense for which he is indicted without at the same time being guilty of the lesser included offense. The lesser included crime is encompassed within the crime for which the accused is indicted. Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985).
There may very well be a separate, distinct and less serious crime which the proof at trial shows the defendant committed, but this does not necessarily mean it is a lesser included offense. To constitute a lesser included offense, every one of the essential ingredients must also constitute essential ingredients of the more serious crime of which the accused is indicted.

(emphasis in original).
Taking Payton's requested instructions in order, it is first necessary to consider Miss. Code Ann. § 97-5-39. That statute in subsection (1) provides as follows:
(1) Any parent, guardian or other person who willfully commits any act or omits the performance of any duty, which act or omission contributes to or tends to contribute to the neglect or delinquency of any child or which act or omission results in the abuse and/or battering of any child, as defined in Section 43-21-105(m) of the Youth Court Law ... shall be guilty of a misdemeanor... .
Payton requested Instruction D-4, which informed the jury that if it found the State had failed to prove felonious child abuse, it must proceed to determine whether the State proved Payton had instead committed a misdemeanor under § 97-5-39(1). Instruction D-4, however, which counsel for Payton offered at trial characterized the alleged act of Payton as one which "contributes to or tends to contribute to the neglect or delinquency of" the child. This instruction was refused by the trial court and correctly so. The crime of misdemeanor child neglect is not encompassed within the definition of the more serious crime of felonious child abuse. In other words, if the State proved the elements of felonious child abuse, it would not follow a fortiori that all the elements of child neglect were also proven. In Matthews v. State, 240 Miss. 189, 192-92, 126 So.2d 245, (1961), the Court turned to the same definition of "neglected child" which now appears as part of the Youth Court Law under § 43-21-105(l):
`Neglected child' means a child whose parent ... or any person legally responsible for his care or support, neglects or refuses when able to do so, to provide for him proper or necessary care or support, or education as required by law, or medical, surgical or other care necessary for his well-being; ... .
Id. at 192-93, 126 So.2d 245.
At trial, Payton repeatedly maintained that she never fed her baby any glass. *1335 Accepting Payton's testimony and ignoring the State's unfavorable evidence altogether, there is a clear lack of any conduct supporting an instruction on any neglect or delinquency of Payton toward her baby. The trial court judge was correct in his determination that the evidence presented did not support an instruction on misdemeanor child neglect. This Court has "repeatedly held that the accused is entitled to a lesser offense instruction only where there is an evidentiary basis in the record therefor." Mease v. State, 539 So.2d 1324 at 1329-30 (Miss. 1989).
We next consider whether § 97-5-39(1) might apply to the present case in another respect  that being through its provision for the crime of misdemeanor child abuse as opposed to neglect.
Assuming her first assignment had merit, Payton contends that since "serious bodily harm" was not proven under felonious child abuse, that certainly misdemeanor child abuse would be a possibility the jury could consider instead. We disagree.
First, there is evidence that Payton did commit the crime of felonious child abuse; that is, there is evidence Payton did (1) intentionally (2) abuse a child (3) in such a manner as to cause serious bodily harm. The next question is whether there is also evidence from which a jury could find Payton guilty of misdemeanor child abuse or simple assault.
Again, subsection (1) of § 97-5-39 provides in relevant part that "Any parent ... who willfully commits any act or omits the performance of any duty, ... which act or omission results in the abuse and/or battering of any child, as defined in Section 43-21-105(m) of the Youth Court Law" is guilty of a misdemeanor. (emphasis added). Section 43-21-105(m), in turn defines "abused child":
(m) "Abused child" means a child whose parent ... or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child ... nonaccidental physical injury or other maltreatment.
Therefore, as to misdemeanor child abuse, the elements to consider include whether Payton did: (1) willfully (2) cause (3) nonaccidental physical injury (4) to a child.
A comparison of the elements of felonious and misdemeanor child abuse reveals the only difference is the provision that the former be committed in such a manner to cause serious harm. It would thus appear that misdemeanor child abuse may indeed be characterized as a lesser included offense of felonious child abuse. However, our inquiry is not ended since, as always, whether an instruction on the lesser offense is required is determined by the state of the evidence.
As discussed previously, there is nothing to suggest that the use of broken glass in the manner described was anything other than action likely to produce serious bodily harm. We are of the opinion that no reasonable juror could find that broken glass slivers in an infant's food are not a means likely to cause serious bodily injury and thus conclude there is no basis to support an instruction on the less serious offense of misdemeanor child abuse.
Payton also sought to have the jury instructed on simple assault. Section 97-3-7(1) provides, in part:
(1) A person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (b) negligently causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm... .
We have held an intentional assault with an eleven-inch knife as the instrument of attack cannot be considered simple assault. Hutchinson v. State, 594 So.2d 17, 20 (Miss. 1992). By the same reasoning, we hold the use of broken glass as described in the case sub judice takes the offense outside the realm of simple assault. Under these facts, no reasonable juror could find the glass slivers were not used in "such a manner as to cause serious bodily harm." Further, there is a clear lack of any evidence from which a juror could conclude the Payton baby accidentally ingested the glass, through negligence or otherwise. In sum, the evidence supports only that this baby was deliberately *1336 fed glass in a manner likely to produce serious injury.
Although the issue of lesser offense instructions is invariably a difficult one, we will adhere to this Court's consistently applied principle that lesser offense instructions should be given only where there is an evidentiary basis in the record therefor. Lee v. State, 469 So.2d 1225 (Miss. 1985); Ruffin v. State, 444 So.2d 839 (Miss. 1984); Colburn v. State, 431 So.2d 1111 (Miss. 1983). Considering Payton's defense and the evidence at trial, there is a clear lack of an evidentiary basis to support her requested instruction on simple assault. This issue is without merit.

CONCLUSION
Accepting the credible evidence consistent with the verdict as true, and taking all reasonable inferences in the light most favorable to the State, we find evidence supporting each element of the crime charged. Williams v. State, 463 So.2d 1064 (Miss. 1985); Glass v. State, 278 So.2d 384 (Miss. 1973). Testimony by the paramedic who first arrived on the scene, a physical examination of the baby and the results of chemical tests for blood in the baby's system all support the element of abuse in such a manner as to cause serious bodily harm. Further, the treating doctor's testimony was that the emergency room report of the baby ingesting glass fragments was consistent with the results of his physical examination.
We decline to disturb the jury's conviction of Payton on charges of felonious child abuse based on Payton's contention that the results of the crime were not sufficiently harmful to the child in this particular instance. This Court has previously said that "just because the injuries may be characterized as slight does not mean the case is automatically one of simple assault" or some other misdemeanor. Hutchinson v. State, 594 So.2d at 20. Instead, "we take the statute as the legislature has given us and read it as fairly and sensibly as we may." Id. Our analysis here leads us to conclude the trial court correctly refused Payton's requested directed verdict and peremptory instruction.
"In cases too numerous to cite, we have reiterated that whether the lesser offense instruction should be given turns on whether there is an evidentiary basis therefore." Id. at 18; See e.g., Ruffin v. State, 444 So.2d 839, 840-41 (Miss. 1984). The issue comes down to whether, in addition to the more serious offense involved, there is also evidence from which a jury could convict a defendant of a lesser included offense. In the instant case, we conclude there was not. The evidence of record does not lend itself to a conclusion that the glass used was not a means likely to cause serious bodily harm, or that the act itself was one of negligence. This was simply not conduct properly included within either of the misdemeanor lesser offense instructions offered.
Issues of lesser included offense instructions are consistently brought before this Court and the area is one in which generalizations are particularly difficult to make. However, we suggest the better practice in most cases is for trial courts to give these instructions where requested, but with the important proviso that there be some degree of support in the record.
CONVICTION OF FELONIOUS ABUSE OF A CHILD AND SENTENCE OF FIFTEEN YEARS, WITH FIVE YEARS SUSPENDED, AFFIRMED.
HAWKINS, C.J., LEE, PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and ROBERTS, JJ., concur.
McRAE, J., concurs in result only.