BARNES, J.,
for the Court:
¶ 1. In March 2011, a Rankin County grand jury returned a five-count indictment against Charles Harris for felonious child abuse of a nine-month old, Sue Brown,[1] under Mississippi Code Annotated section 97-5-39 (Rev.2006). The counts included breaking her left arm (Count I), breaking her right arm (Count II), burning her fingers (Count III), burning her lips and mouth (Count IV), and striking her chest causing “bilateral pneumothoraces”[2] (Count V). A jury convicted Harris on Count III, but was unable to reach a verdict regarding the other counts, resulting in a mistrial for those counts. The trial court sentenced him to thirty years in the custody of the Mississippi Department of Corrections (MDOC), with eight years suspended and five years of supervised probation. Harris now appeals, raising three issues. He argues a mistrial should have been declared when the prosecution played a video recording to the jury. The video contained Harris’s alleged exercise of his post-Miranda[3] right to an attorney during a custodial interview. He also claims the trial court erred in refusing a lesser-offense jury instruction on simple assault and a lesser-included-offense jury instruction on misdemeanor child abuse. Finally, he argues the verdict is against the weight of the evidence. Finding no error, we affirm.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. In March 2009, Sue, Carrie Cran-dle’s nine-month-old daughter, suffered injuries after a series of “accidents” while under the care of her nineteen-year-old babysitter, Harris. Crandle and the baby’s father, George Brown, had been living together in Jackson, Mississippi, when Sue was born, but three weeks after her birth, George relapsed into drug addiction. Crandle left Jackson and took Sue and her four-year-old half-brother to Leakesville, Mississippi, where some relatives live. She stayed with her best friend and received food stamps. After six weeks, Brown found a place for Crandle and the children to live in Florence, Mississippi, where they moved in August 2008. Through the WIN Job Center, Crandle *929 obtained a job at a hotel in Brandon, Mississippi, as a front desk clerk, where she worked the night shift most of the time.
¶ 3. When issues arose with the childcare arrangements Crandle had initially made with friends and family, she began looking at babysitting services. She searched websites and interviewed a couple of individuals. Harris, whom Crandle had met at a church in Pearl, Mississippi, had offered to watch her children, but she initially declined his offer. Crandle had known him for three or four months. Having difficulty finding a babysitter, though, Crandle decided to contact Harris. Harris lived in a house with his grandparents, sister, uncle, uncle’s girlfriend, and uncle’s three children. Crandle set up a meeting to inspect the house and meet Harris’s family. After the meeting, Cran-dle felt it would be “okay” to have her children cared for by Harris at his home. At first, Crandle sent only her son, but after Harris did “fine” with him, she also started leaving Sue. At the time, Sue was neither walking nor crawling.
¶ 4. On March 6, 2009, Crandle received a text message from Harris, stating he thought Sue’s arm might be broken. Harris then called Crandle and explained Sue had been “fussy.” When he was changing her diaper, she rolled off the bed and landed on a walking cane on the floor. Harris stated he then picked Sue up and put her in his bed, where she cried a bit and then went to sleep.
¶ 5. Crandle called Harris’s grandmother to see “what was going on.” After speaking with the grandmother, Crandle decided to leave work early and take Sue to River Oaks Hospital in Flowood, Mississippi. In the emergency room, Sue’s left and right arms were x-rayed. Physicians confirmed Sue’s left arm was broken. While at the hospital, Crandle also met with a social worker due to the nature of Sue’s injury and her age. At this point, Crandle did not suspect Harris of abuse.
¶ 6. On March 22, 2009, Crandle left work at 11:00 p.m. to pick up her children from Harris’s house. She found Sue sitting on Harris’s bed and noticed a bandage on Sue’s right middle finger. Harris explained to Crandle that Sue had a blister on her finger and had chewed it off. Crandle also noticed Sue’s mouth had a red, blistery rash on it, and there were blisters on three fingers of her other hand. Harris claimed ignorance about what happened to Sue’s fingers.
¶ 7. Crandle immediately took Sue to the Crossgates River Oaks Hospital emergency room in Brandon. Sue’s fingers were treated, and it was recommended Crandle follow up with Sue’s pediatrician, Dr. Phyllis Hightower. The next day, Dr. Bettie Knight saw Sue because Dr. Hightower was out. She informed Crandle that Sue had second-degree burns on her fingers caused from heat.
¶ 8. On March 24, 2009, Crandle took Sue to the Mississippi Sports Medicine Center for a follow up visit for Sue’s broken arm. Crandle then took Sue back to Dr. Hightower’s office to change the bandages on Sue’s fingers. But when Dr. Hightower took Sue from Crandle’s arms to examine her, Sue emitted “a high-pitched cry ... in obvious discomfort” as the physician held Sue around her trunk. Concerned about possible rib fractures, Dr. Hightower ordered a full skeletal survey of Sue at Rankin General Hospital’s emergency room. Crandle proceeded to the hospital with Sue where the x-ray was performed. Physicians discovered Sue had additional injuries — her right arm was also broken, and there were issues with her lungs. Sue was taken by ambulance to the University of Mississippi Medical Center (UMMC), where she had to have emergency surgery due to her lung injuries. *930 Sue was in the pediatric intensive care unit (PICU) for four days and in the hospital for six days.
¶ 9. On March 26, 2009, Officer Sheila Tucker, a juvenile investigator in the Rankin County Sheriffs Office, interviewed Harris. A video recording of the interview was taken. Initially, Harris denied knowing what happened to Sue, and suggested that maybe Sue’s father injured her, even though Sue had not been around her father lately. Then, he proposed that the injuries occurred when he was asleep, or his cousins might have burned Sue’s fingers. Later, he suggested a lamp might have caused the burns. Toward the end of the interview, he admitted that the burned fingers and one broken arm occurred during his care. But, he maintained that he did not know how Sue’s lungs became collapsed. After being advised of his Miranda rights, Harris signed a waiver and, at the end of the interview, gave a written statement.[4]
¶ 10. In his written statement, Harris explained that when Sue “first broke her right arm,” he had set her on his bed against the wall with pillows and gone into the kitchen for five minutes to eat a piece of cake. The statement continues that on March 21, 2009, Sue was on his bed and dropped her pacifier on the floor.[5] When she reached for it, she nearly fell off his bed. Harris grabbed her right arm and heard a “pop.” Sue started to cry; so, he gave her a bottle, and she threw up on his bed. Regarding Sue’s burned fingers, Harris stated that while he was giving her a bath, Sue reached for a burning tea candle and got wax on her finger tips. He immediately rinsed her fingers off in cold water. His grandmother came to see where Sue “puked” on his bed, and held her while he flipped the mattress. Harris soon went to sleep and claims he did not know how Sue’s lungs became collapsed, unless he rolled onto her while asleep. He admits that while he told Crandle about Sue’s throwing up, he “withheld the part about Sue almost falling off [his] bed and her burned fingers.”
¶ 11. In February 2011, during a pretrial hearing,[6] Harris moved to suppress the written statement, which was prepared at the end of his interview, because he invoked his right to counsel. After watching the videotape of the interview, the trial judge ruled that Harris did not actually assert his right to counsel; thus, Harris’s written statement could be admitted into evidence.
¶ 12. In February 2012, Harris’s trial began. Testifying for the State were Crandle, Officer Tucker, and five physicians who treated Sue’s various injuries in March 2009, including her pediatrician, Dr. Hightower.
¶ 13. During Officer Tucker’s examination, she explained that Harris admitted the only other person in the house having contact with Sue was his grandmother, who did so occasionally. Importantly, Harris also admitted to Officer Tucker that Sue was injured only during his care.
¶ 14. While Officer Tucker was on the witness stand, defense counsel objected to the admission of the video recording of Harris’s interview with Officer Tucker. The trial judge overruled the objection, and the video was played to the jury. The defense counsel then moved for a mistrial. He again argued, as he did at the hearing *931 in February 2011, that Harris invoked his right to an attorney, and that portion of the video “should have been redacted.” The trial judge denied the motion for a mistrial.
¶ 15. Dr. Barry McCay testified for the State. He was accepted by the court as an expert in digital radiology. He also interpreted the x-rays of Sue’s arms taken on March 7, 2009, at River Oaks Hospital. At the time, he found the left arm had a buckle fracture, and the right arm had a possible fracture.[7] The injuries were recent. He stated it was unlikely Sue broke her arm falling off Harris’s bed onto a cane, and it was “impossible” for her to break both arms in such a manner. It was his opinion that having both upper arm bones broken is “highly suspicious of child abuse.”
¶ 16. Dr. Lawrence Dautenhahn was also accepted by the court as an expert in the field of pediatric radiology. He had reviewed Sue’s x-rays taken on March 24, 2009, at Crossgates River Oaks Hospital. The x-rays showed that both arms were fractured, both lungs were partially collapsed, and air was present in the soft tissues of her chest wall up to her neck. Dr. Dautenhahn stated a nine-month-old infant would not break both arms falling off a bed onto a carpeted floor and hitting a cane. He stated a child’s bones are pliable and difficult to break. He also found Sue’s injuries not accidental but consistent with child abuse.
¶ 17. Dr. Neva Ekland, a pediatric dentist at UMMC, testified about the ulcera-tive lesions found inside Sue’s mouth and upper lip. She claimed all of these injuries occurred at the same time. It was her opinion, to a reasonable degree of medical certainty, that the lesions were “consistent with the forced feeding of hot liquid or hot feeding implements,” such as a bottle, forcibly held in Sue’s mouth.
¶ 18. Dr. Scott Benton, a professor of pediatrics and chief of the forensic medicine department at UMMC, as well as the medical director of the Children’s Justice Center, was accepted as an expert in the field of pediatric forensic medicine. Dr. Benton had been consulted by the pediatric trauma surgeon at UMMC about the possibly abusive nature of Sue’s injuries while she was in the PICU. Dr. Benton explained Sue’s most pressing injuries were pneumothorax in both areas of her chest; pneumopericardium[8] around her heart; pneumomediastinum[9] around her back and chest; air around her kidneys; and “pulmonary contusions,” or bruises inside her lungs due to trauma. In his opinion, “what caused great concern” was that Sue’s second-degree burns were not caused by “a child exploring [her] environment” by reaching out to touch an object such as a hot lamp, a burning candle, or hot wax, because the burns were not on her dominant fingers. He considered this fact a “red flag” for abuse. He testified that burns “on both sides of the body,” such as her finger burns, were also a “red flag.” It was his opinion the burns came from an object that could get hot enough to touch and burn solidly the tips of the fingers. Dr. Benton concluded that Sue’s *932 injuries were not accidental, and it was his opinion she was an abused child.
¶ 19. Harris chose not to testify at trial, and the defense did not put on any other witnesses. While jury instructions for each count were given on felonious child abuse, the trial court refused the defense’s request for jury instructions on the lesser offense of simple assault and the lesser-included offense of misdemeanor child abuse.
¶20. The jury found Harris guilty of felonious child abuse for Count III of the indictment (for burning Sue’s fingers), but the jury was unable to reach a verdict with respect to Counts I, II, IV, and V. Therefore, the trial judge declared a mistrial on those counts. The jury was also unable to affix a life sentence to Harris’s conviction for Count III. Thus, following a sentencing hearing, the trial judge sentenced Harris to thirty years in the custody of the MDOC, with eight years suspended and five years of supervised probation. Harris filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which was denied.
ANALYSIS
I. Motion for Mistrial
¶ 21. Harris argues that it was an “incurable” error for the jury to have heard his alleged request for an attorney during the video recording of his custodial interview. Thus, he claims his motion for a mistrial should have been granted. Relat-edly, he argues his privilege against self-incrimination and his right to counsel were violated.
¶ 22. During the February 2011 hearing, the trial judge ruled that Harris did not invoke his right to counsel at the end of the interview. One year later, at trial,[10] the trial court overruled defense counsel’s objection to the admission of the video recording. After the video recording was played for the jury, the defense moved for a mistrial, claiming Harris’s alleged request for an attorney should have been redacted. The trial judge denied the motion, but admitted it would have been better had that portion of the video been redacted.
¶ 23. “Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion.” Gunn v. State, 56 So.3d 568, 571 (¶ 14) (Miss.2011) (quoting Caston v. State, 823 So.2d 473, 492 (¶ 54) (Miss.2002)). Under Miranda, the accused must be informed of the right to remain silent and the right to an attorney before any custodial interrogation occurs. Barnes v. State, 30 So.3d 313, 316 (¶ 8) (Miss.2010) (citing Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). “Once a defendant asks for counsel, he cannot be interrogated further until counsel has been made available, ‘unless the accused himself initiates further communication, exchanges, or conversations with the police.’ ” Id. at 316-17 (¶8) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). In determining whether a defendant’s right to counsel has been violated, there are two considerations. Chamberlin v. State, 989 So.2d 320, 332 (¶ 36) (Miss.2008) (citing Holland v. State, 587 So.2d 848, 856 (Miss.1991)). First, the defendant must have actually invoked his right to counsel. Id. Second, if he did, he must not be subject to further interrogation until counsel is made available to him, unless he initiates communica *933 tion with law enforcement himself. Id. (citing Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880). An invocation of counsel must be unambiguous; “an ambiguous mention of possibly speaking with one’s attorney is insufficient to trigger the right to counsel.” Delashmit v. State, 991 So.2d 1215, 1220 (¶ 14) (Miss.2008) (quoting Grayson v. State, 806 So.2d 241, 247 (¶11) (Miss.2001)). “A suspect must articulate his ... desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.” Id. (quoting Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)).
¶ 24. It is undisputed that Harris was properly given his Miranda warnings. The March 26, 2009 interview at the police department began at approximately 3:00 p.m. On the video, Officer Tucker read Harris his rights, and gave him a copy of a waiver-of-rights form, which contained the standard Miranda warnings. Harris signed the waiver-of-rights form at 3:06 p.m., noting that he was “willing to answer questions without a lawyer present.” Officer Tucker testified that Harris understood his waiver of rights. Harris willingly spoke with Officer Tucker for approximately forty-five minutes, with Officer Tucker stepping out of the room twice. At the end of the interview, Officer Tucker instructed Harris to write down everything he could remember about how Sue came to be injured in a statement. As she was leaving the room, Harris asked, “Can I ask a lawyer for legal advice?” Officer Tucker responded, “Yes, you can get a lawyer any time you want to.” Harris responded “ok,” then looked down and began writing his statement. Officer Tucker left the room, and the interview concluded. Officer Tucker returned to the room at 4:49 p.m. to retrieve Harris’s completed statement.
¶25. We agree with the trial court that Harris did not actually invoke his right to counsel. The only time Harris mentioned a lawyer was at the end of the interview. Further, his question was posed as more of a request for reassurance that he could get a lawyer at some point. Also, after Harris asked the question, he continued communicating with law enforcement by writing his statement. Officer Tucker did not coerce Harris to write the statement. It is doubtful that a reasonable police officer would understand Harris’s question alone to be an unequivocal assertion of the right to counsel. And even if Harris’s comment about an attorney was an invocation of his right to counsel, all questioning had ceased by that time, as the interview had concluded. We find no violation of Harris’s right to counsel or his privilege against self-incrimination.
¶ 26. Additionally, Harris argues that he was “incurably” prejudiced by the jury’s hearing his request for an attorney; yet, we cannot see how. The statement was not an implication of guilt. Throughout the interview, Harris denied either injuring Sue, or injuring her intentionally. Further, his written statement was entirely exculpatory in nature. The jury could have chosen to believe Harris’s explanations for Sue’s burned fingers, but did not. Accordingly, the trial court did not abuse its discretion in denying Harris’s motion for a mistrial.
II. Jury Instructions
¶ 27. Harris next argues that the trial court erred in refusing two jury instructions: the lesser-included offense of misdemeanor child abuse (D-12), and the lesser-nonincluded offense of simple assault (D-17). The jury was instructed that it could find Harris guilty or not guilty of the *934 crime of felonious child abuse for each count. The elements of felony child abuse found in the given jury instruction (S — 3) included whether Harris: (1) “willfully, unlawfully, and intentionally”; (2) “whipped, struck or otherwise abused or mutilated [Sue]”; (3) “in such a manner as to cause serious bodily harm to [Sue] by burning her fingers.” See Miss.Code Ann. § 97-5-39(2).
¶28. When a party claims that he is entitled to a lesser-included-offense jury instruction, the standard of review is de novo, as it is a question of law. Downs v. State, 962 So.2d 1255, 1258 (¶ 10) (Miss.2007). Both lesser-included-offense instructions or lesser-nonincluded-offense (also known as “lesser-offense”) instructions should only be granted if there is an evidentiary basis in the record. Delashmit, 991 So.2d at 1221 (¶ 18) (citing Griffin v. State, 533 So.2d 444, 447 (Miss.1988)). The Mississippi Supreme Court has stated for both lesser-included offenses and lesser-nonincluded offenses:
An instruction should be granted unless the trial judge — and ultimately [the appellate court] — can say, taking all the evidence in the light most favorable to the accused and considering all reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).
Williams v. State, 53 So.3d 734, 741 (¶ 34) (Miss.2010) (quoting Mease v. State, 539 So.2d 1324, 1330 (Miss.1989)). Another factor to consider is “the disparity in maximum punishments.” Id. at (¶ 33) (citing Boyd v. State, 557 So.2d 1178, 1181 (Miss.1989)). However, even if a disparity exists, the trial judge still cannot give instructions on “pure speculation”; there must be “some evidence regarding the lesser included [or lesser-nonincluded] offense.” Id.
¶ 29. Here, the trial judge denied both of these instructions based on Payton v. State, 642 So.2d 1328 (Miss.1994). In Pay-ton, the jury found the defendant guilty of felony child abuse. Id. at 1329. The evidence showed the defendant-mother had been intentionally feeding her baby crushed glass, causing scratches to the baby’s palate and bleeding in the baby’s gastrointestinal tract. Id. at 1330-31. The Mississippi Supreme Court found the trial court properly refused jury instructions on misdemeanor child neglect, or child abuse, and simple assault. Id. at 1335-36. We find Payton analogous, and that the trial court did not err in refusing these two instructions.

A. Jury Instruction D-12: Misdemeanor Child Abuse

¶ 30. Harris argues it was error for the trial court to refuse the lesser-included-offense jury instruction D-12 on misdemeanor child abuse.[11] The jury instruction stated that if the jury found beyond a reasonable doubt that Harris “did wilfully ... cause non-accidental physical injury” to Sue, he should be found guilty of misdemeanor child abuse. See Miss.Code Ann. § 97-5-39(1); see also Miss.Code Ann. § 43-21-105(m) (Rev.2009).
¶ 31. Harris claims there was evidence presented for misdemeanor child abuse, because it was unknown exactly *935 what object actually caused the burns on Sue’s fingers. We do not find this argument persuasive. As Payton discusses, the only difference between misdemeanor and felonious child abuse is the degree of the injury — whether there was “serious bodily harm” or not. See Payton, 642 So.2d at 1335. The medical evidence shows that the burns to Sue’s fingers were “second-degree” burns — which cannot be classified as anything other than “serious bodily harm” regardless of their cause. Accordingly, no reasonable jury could find Harris guilty of merely misdemeanor child abuse. There was no evidentiary basis for this instruction, and a lesser-included instruction cannot be granted based on speculation. The trial judge did not err in refusing the jury instruction on misdemeanor child abuse.

B. Jury Instruction D-17: Simple Assault

¶ 32. Harris claims the lesser-offense jury instruction for simple assault should have been given. The instruction read that if the jury found beyond reasonable doubt that Harris “purposefully, knowingly, or recklessly” caused “bodily injury” to Sue, he should be found guilty of simple assault. See Miss.Code Ann. § 97-3-7(l)(a) (Supp.2012).
¶ 33. Harris argues there is an evidentiary basis arising out of the same operative facts pled in the indictment for an instruction of simple assault, and there is no evidence Harris intentionally burned Sue’s fingers. We disagree. Some of the strongest evidence against Harris presented at trial was the fact that Sue’s burns were on her nondominant fingers, as testified to by Dr. Benton. Therefore, the burns were not caused by a child exploring her environment. It was Dr. Benton’s unequivocal opinion the burns were nonacci-dental. Further, the burns came from a hot, solid object. Again, under these facts, no reasonable juror could find Sue’s second-degree burns on nondominant fingers were not considered “serious bodily harm.” The trial judge properly refused the jury instruction on simple assault.
III. Weight of the Evidence
¶ 34. “A motion for [a] new trial challenges the weight of the evidence. A reversal is warranted only if the lower court abused its discretion in denying a motion for [a] new trial.” Dilworth v. State, 909 So.2d 731, 737 (¶ 20) (Miss.2005) (quoting Howell v. State, 860 So.2d 704, 764 (¶ 212) (Miss.2003)). This Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005). The evidence will be considered in the light most favorable to the verdict. Id. As stated earlier, the elements of felonious child abuse are whether the defendant “(1) intentionally (2) abuse[d] a child (3) in such a manner as to cause serious bodily harm.” Payton, 642 So.2d at 1335; Miss.Code Ann. § 97-5-39(2).
¶ 35. Harris argues that the jury was not presented with any evidence of a motive to injure Sue, or of the element of intent. We disagree. First, proof of motive was not required as it is not an element of felonious child abuse. However, the jury could have thought Harris burned Sue because he was angry with Sue for “puking” in his bed. In his statement, Harris says Sue was burned while he was giving her a bath right after she became sick. Second, evidence that Harris intentionally burned Sue was presented to the jury. Expert witness Dr. Benton, who treated Sue at UMMC, found Sue’s burns consistent with child abuse because *936 the burns were on both hands and the burns were not on her dominant fingers. He testified that infants Sue’s age explore and grab objects with their thumb and index fingers, yet Sue did not have burns on these fingertips. He also opined the burns were from a solid hot surface. At trial, Harris did not refute this evidence.
¶36. Harris’s explanations for Sue’s burned fingers were numerous, contradictory, and inconsistent with the medical testimony. Initially, he told Crandle that Sue had chewed a blister off of one finger, but he could not give a good explanation of what happened, and feigned ignorance. Later, Harris’s various other explanations for the burns were a lamp, chemicals, and a tea candle. And even though Crandle did admit to having three space heaters in her own home, she testified Sue was not injured prior to going to Harris’s house, and there is no evidence to contradict her testimony. Also, the jury was presented with evidence that Sue, at nine months of age, could neither walk nor crawl.
¶ 37. Considering the evidence in the light most favorable to the verdict, the jury was presented with substantial evidence to support Harris’s conviction for felonious child abuse. Therefore, the trial court did not abuse its discretion in denying Harris’s motion for a new trial.
¶ 38. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF FELONIOUS CHILD ABUSE AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH EIGHT YEARS SUSPENDED AND FIVE YEARS OF SUPERVISED PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ„ CONCUR.

. Due to the sensitive nature of this case, pseudonyms have been used for the victim, her mother, and her father to protect their privacy.

. "Pneumothorax [ (pl.pneumothoraces) ] is the collection of air or gas in the space inside the chest around the lungs, which leads to a lung collapse.” Medline Plus, http://www. nlm.nih. gov/medlineplus/ency/article/007312. htm (last visited Sept. 5, 2013).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

.Both the video recording and the written statement were entered into evidence, but parts of each were redacted to exclude inadmissible evidence.

. The statement is disjointed here, probably due to redaction.

. The trial was continued until February 2012.

. The right arm was later found to be fractured as well.

. Pneumopericardium is air within the pericardium, or air surrounding the heart. Radi-opaedia.org., http://radiopaedia.org/articles/ pneumopericardium (last visited Sept. 5, 2013).

.Pneumomediastinum is air in the space in the middle of the chest, between the lungs. Medline Plus, http://www.nlm.nih.gov/ medlineplus/ency/article/000084.htm (last visited Sept. 5, 2013).

. We note at the hearing the year before, in February 2011, the defense did not move to suppress the video recording, nor did counsel object to this portion of the video then.

. As the defense pointed out, there appears to be a typographical error in jury instruction D-12, as both D-l 1 (also refused) and D-12 deal with Count II and the lesser-included offense of misdemeanor child abuse. It would seem that D-12 was offered for Count III, not Count II.