# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-KA-01304-SCT

*KADEDRIA HAMPTON*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 08/14/2019 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| TRIAL COURT ATTORNEYS: | RICHARD BROOKS LEWIS, JR. |
| | KIMBERLY DENICE McCRAY |
| | WILLIAM HARVEY GRESHAM, JR. |
| | ROSHARWIN LEMOYNE WILLIAMS |
| | STEPHANIE ALEXIS BROWN |
| | WALTER ERIC BLECK |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| | RICHARD BROOKS LEWIS, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 01/21/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.

### BEAM, JUSTICE, FOR THE COURT:

¶1. Kadedria Hampton appeals from her convictions in the Coahoma County Circuit Court on two counts of felony child abuse for burning and starving a minor child under Mississippi Code Sections 97-5-39(2)(a)(i) and -39(2)(a)(v) (Rev. 2014), respectively.

Hampton claims that her constitutional right to be present at every stage of her jury trial was violated and that the evidence was constitutionally insufficient to support either of her convictions.

¶2. We find no merit to the claim that Hampton's constitutional right to be present at trial was violated. Nor do we find merit to the claim that the State presented insufficient evidence to support a conviction for felonious starvation of a minor child. We do find, however, that the State presented insufficient evidence to support Hampton's conviction of the felonious burning of a minor child. Accordingly, we affirm in part and reverse and render in part.

**FACTS**

¶3. In March 2015, Hampton moved in with her boyfriend, Rickey Taylor, in Clarksdale, Mississippi. Taylor's three-year-old son, LRJ,[1] and Hampton's two sons lived with them.[2] On April 21, 2015, Hampton had Taylor's baby, who also lived with them.

¶4. On May 1, 2015, Hampton took LRJ to the emergency room for a head injury and two swollen eyes. Jasmine Nolan, the registered nurse who treated LRJ, testified that LRJ was very frail and appeared weak, thin, and frightened when he arrived at the emergency room. When Nolan gave LRJ a bottle of water and graham crackers, he acted very protective of the food once he got it in his hands. LRJ drank two more bottles of water and ate a hamburger and french fries while in the emergency room. Hampton had her newborn baby and her other

_____

[1] LRJ is substituted for the actual name of the minor.

[2] Hampton is not the biological mother of LRJ, and Taylor is not the biological father of Hampton's two sons.

two children with her at the emergency room. According to Nolan, Hampton's other children did not look frail, thirsty, or hungry.

¶5. Because of LRJ's frail appearance and suspicious injuries, law enforcement and Child Protection Services were contacted. Clarksdale Police Detective Nicholas Turner and Investigator Frederick Burton interviewed Hampton at the hospital regarding the contusions on LRJ's head and his swollen eyes. According to Turner and Burton, Hampton seemed agitated when they questioned her. Hampton said LRJ fell and hit his head trying to get his "sippy cup" off the top of a clothes hamper.

¶6. Stephanie Smith, a family-protection specialist with the Coahoma County Child Protection Services opened an investigation into the suspected abuse of LRJ. Smith testified that she made a number of visits to the home where LRJ lived with Hampton and Taylor. On the second visit, Smith knocked on the door and could hear a child crying inside, but no one would open the door. Smith called Taylor, who then contacted Hampton to open the door.

¶7. Smith made three visits to the home before having a family team meeting in June 2015 with Hampton and Taylor. Smith discussed with them her concerns based on her previous home visits. Smith let Hampton and Taylor know that Child Protection Services would be monitoring the family and helping them with any services they needed in order to correct the problems that she had observed.

¶8. According to Smith, during each visit she made to the home, Hampton's children would be playing while LRJ was asleep on the bed. Smith said that Taylor was not at home during her visits. Smith also testified that the home had a refrigerator that was kept locked

3

with a chain that only Hampton and Taylor could unlock. She said Taylor told her that it was to keep the kids from going into the refrigerator.

¶9. On July 1, 2015, Smith made another home visit. Hampton was at home with LRJ, the baby, and her two children. Hampton's two children were playing, and LRJ was asleep in bed. Even though it was hot in the house, LRJ was wearing a long-sleeve thermal shirt, jeans, and long socks.

¶10. When Smith woke LRJ, he told her that his arms and legs hurt and that he was hungry. Smith said LRJ appeared more frail than on her previous visits. Smith lifted LRJ's pants legs and saw scabs on his legs. Smith told Hampton that she needed to feed LRJ; Hampton responded that she would fix him a pizza. Smith then told Hampton that she was going to the office for paperwork and that she would be back to take LRJ to the doctor.

¶11. Smith called Taylor to advise him that she was going to take LRJ to the doctor and offered him a ride there, but he declined. When Smith returned to the home, Taylor was there with LRJ and had been searching for LRJ's Medicaid card. Smith said LRJ was wearing different clothes but still had on long pants. On the way to the hospital, Smith stopped by Wendy's to get LRJ something to eat and drink. She said LRJ drank a 12 oz. cup of water in the car and was still thirsty afterwards.

¶12. LRJ was admitted to the local hospital, and he was transferred to LeBonheur Children's Hospital in Memphis, Tennessee, the following day. Law enforcement was again contacted because of LRJ's injuries.

¶13. Detective Turner was notified on July 2, 2015, of the possible assault of LRJ. Upon arriving at the hospital, Turner talked to the social worker and took photographs of LRJ, which showed burns to LRJ's legs and hair loss from his head. Turner also noticed LRJ's small size for a boy his age.

¶14. Turner and Burton interviewed Hampton and Taylor separately at the police station. Both gave recorded statements. Afterwards, Turner charged both Hampton and Taylor with child abuse and neglect.

¶15. A Coahoma County grand jury indicted Hampton on two counts of felony child abuse. The case went to trial in 2016, ending in a mistrial.[3] Hampton was retried in August 2019.

¶16. At Hampton's 2019 trial, Turner testified that when he observed Hampton's own children, they appeared to be healthy and of normal size without injuries. He said that when he interviewed Hampton, she admitted that it had been weeks since she had bathed LRJ and that she did not bathe the children every day because of her newborn baby. Hampton confirmed that she was the one responsible for feeding, bathing, and clothing the children, including LRJ. Hampton never admitted that she saw the burns on LRJ's legs.

¶17. Dr. Karen Lakin testified at Hampton's trial both as a fact witness and as an expert in general pediatrics and pediatric child abuse. Dr. Lakin first saw LRJ on July 3, 2015, when he was transferred to LeBonheur due to concern for burns and malnutrition. Dr. Lakin said that the burns on LRJ's legs were second-degree burns that had started healing and that they were more than a few days old. She said that after extensive testing, they determined

---

[3] Taylor was also indicted, and both he and Hampton were tried together in 2016. Taylor eventually pleaded guilty to two counts of child abuse in 2017.

that LRJ had suffered a compression fracture of the spine in the lumbar region. LRJ also suffered from osteopenia, which is something typically seen when a child is malnourished or suffering from malnutrition. Because of the bruising to LRJ's face and a history of head trauma, Dr. Lakin said they performed a CT scan of his head, which indicated that he had atrophy to the brain related to dehydration and malnourishment. Dr. Lakin said that LRJ appeared very thin and unhealthy looking and that he looked younger than his age.

¶18. Hampton testified in her own defense. She said that she and two of her children moved in with Taylor in March 2015 because she was having his baby. She said LRJ had moved in with him around that time, but she was not sure exactly when. Hampton testified that she was the one responsible for feeding, bathing, and clothing LRJ and her children before the baby was born. Hampton said that after delivering the baby, she was put on bed rest and could not do anything. She said that Taylor worked two part-time jobs and that there were days when he was home the entire day; on those days, Hampton said he would bathe LRJ and clothe LRJ. Hampton said there was plenty of food in the house because she was on "food stamps," and she did not do anything to starve LRJ. When asked by defense counsel if it was possible that Taylor could have injured LRJ, Hampton said that it was possible he could have but that she did not know.

¶19. The jury found Hampton guilty on both counts of felony child abuse. The trial court sentenced Hampton to twenty years in the custody of the Mississippi Department of Corrections on each count to run concurrently, with five years suspended on each count.

**DISCUSSION**

6

**I.    Whether the trial court violated Hampton's Sixth Amendment right to be present at every stage of her trial.**

¶20.    On the second day of Hampton's trial, Hampton was not present in the courtroom when her trial was scheduled to resume at 9:00 a.m. as instructed by the trial judge at the close of proceedings on the first day of trial.  At 9:26 a.m., when proceedings were about to begin, the trial court inquired about Hampton's whereabouts outside the presence of the jury. Defense counsel said he did not know where Hampton was and that his secretary had spoken with Hampton's sister, who had gone to locate Hampton.  Defense counsel said he did not have Hampton's phone number and that he had communicated with her in the past through relatives.

¶21.    The trial judge noted that Hampton was in the courtroom the previous day when he announced that the parties were to return the following morning at nine o'clock. At 9:28 a.m., the judge remarked that Hampton had ample opportunity to arrive and had failed to do so. The judge then instructed the bailiff to call for Hampton in the courthouse halls to no avail.

¶22.    Afterward, the judge ruled as follows:

> [B]ased on the evidence before the [c]ourt–the [c]ourt finds that the defendant, for whatever reason, has voluntarily absented herself from the trial.  She had knowledge of the trial. She participated in the trial the day before, on Monday, was aware that the trial would recommence at nine o'clock this morning.  She has failed to appear.  It is now 9:30.  She has been called.  Her counsel has no idea as to [her] whereabouts.

¶23.    Defense counsel then requested that deputies be sent to look for Hampton, which the judge refused, saying he did not want to order the sheriff to take on that responsibility.  The judge instructed that no mention was to be made to the jury about Hampton's absence.  Trial

7

resumed at 9:36 a.m., with the jury's returning to the courtroom and Detective Burton's being called to resume his testimony.

¶24.    While on the stand, Burton authenticated the DVD containing Hampton's July 2 recorded interview. As the State attempted to play the DVD, it encountered technical difficulty, so the judge recessed the trial at 9:45 a.m., at which point Hampton entered the courtroom. The judge resumed trial at 9:54 a.m. with Hampton present. Before the noon recess and outside the jury's presence, Hampton told the judge that she was late for court because one of her children was sick and that she (Hampton) had overslept.

¶25.    Both our federal and state constitutions guarantee an accused's right to be present at every stage of his or her trial. U.S. Const. amend. VI; Miss. Const. art. 3, § 26. This right, however, may be waived. *Taylor v. United States*, 414 U.S. 17, 19-20, 94 S. Ct. 194, 38 L. Ed. 2d 174 (1973); *Blanchard v. State*, 55 So. 3d 1074, 1077-78 (Miss. 2011) (quoting *Jay v. State*, 25 So. 3d 257, 264 (Miss. 2009)). Under Rule 10.1(b)(1)(B) of the Mississippi Rules of Criminal Procedure, a criminal defendant's absence from his or her trial will be considered waived "if the court finds that such absence was voluntary and constitutes a knowing and intelligent waiver of the right to be present."

¶26.    We find no abuse of discretion in the trial court's decision to resume trial without Hampton's being present. The trial court had instructed both parties at the close of the first day of trial that trial would resume the next morning at nine o'clock. Hampton failed to appear until 9:45 a.m.

¶27. Contrary to Hampton's argument on appeal, the trial court was not required to send out law enforcement to look for her. Under Rule 10.1(d) of the Mississippi Rules of Criminal Procedure, "the court, by order, *may* direct law enforcement officers forthwith to bring the defendant before court." Miss. R. Crim. P. 10.1(d) (emphasis added).

¶28. Lastly, Hampton's reliance on the Court of Appeals' decision in **Haynes v. State**, 208 So. 3d 4 (Miss. Ct. App. 2016), is not well taken. **Haynes**, persuasive authority only in this Court, was decided before the advent of the Mississippi Rules of Criminal Procedure, which went into effect by order of this Court on July 1, 2017. Hampton was tried in August 2019, and the trial court properly complied with Rule 10.1(b).

¶29. This issue is without merit.

**II. Whether the evidence presented was sufficient to support Hampton's convictions of felony child abuse.**

¶30. Hampton claims that the evidence presented fails to establish the most critical element of the alleged crimes: who committed the acts charged. She contends that there were two persons providing care for LRJ. And the jury, "confronted with a fifty-fifty proposition," was relieved of the necessity of choosing between who committed the acts of abuse by the trial court's grant of aiding-and-abetting jury instruction. But, Hampton contends, any proof of her acting in concert with Taylor is "pure speculation."

¶31. Hampton contends that the testimony of the State's own expert, Dr. Lakin, demonstrates the lack of sufficient evidence to sustain the jury's guilty verdicts. Even though Dr. Lakin was accepted as an expert in the field of child-abuse pediatrics, her expert opinion indicated, according to Hampton, only possible "moderate malnutrition" of LRJ, a situation

9

that occurred over a short period of time. Dr. Lakin stated that many of the injuries or conditions observed on LRJ "could have" been the result of neglect, which Hampton contends means that they could also have other causes. Hampton claims that Dr. Lakin never testified to any abuse that could be connected to Hampton.

¶32. In reviewing a challenge to the sufficiency of the evidence for a criminal conviction, "we view all evidence in the light most favorable to the State." *Thomas v. State*, 277 So. 3d 532, 535 (Miss. 2019) (citing *Cotton v. State*, 144 So. 3d 137, 142 (Miss. 2014)). This Court will reverse and render judgment in favor of the defendant "only if the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.'" *Young v. State*, 119 So. 3d 309, 315 (Miss. 2013) (internal quotation mark omitted) (quoting *Hughes v. State*, 983 So. 2d 270, 275-76 (Miss. 2008)).

¶33. "[A]ll the proof need not be direct and the jury may draw any reasonable inferences from all the evidence in the case." *Campbell v. State*, 278 So. 2d 420, 423 (Miss. 1973) (citing *Woodward v. State*, 180 Miss. 571, 178 So. 469 (1938)). And "intent may be proven by circumstantial evidence." *Stinson v. State*, 375 So. 2d 235, 236 (Miss. 1979) (citing *Pearson v. State*, 248 Miss. 353, 158 So. 2d 710 (1963)).

¶34. Section 97-5-39(2)(a) provides, in pertinent part:

> (2) Any person shall be guilty of felonious child abuse in the following circumstances:

> (a) Whether bodily harm results or not, if the person shall intentionally, knowingly or recklessly:

(i) Burn any child;

. . . .

(v) Starve a child of nourishments needed to sustain life or growth[.]

¶35. Dr. Lakin testified that based on her expert opinion and medical findings, LRJ suffered from nutritional neglect. A CT scan performed on LRJ on July 3, 2015, showed brain atrophy or "shrinkage" of the brain, which according to Dr. Lakin, was "probably reflective of the fact that LRJ came in [to the hospital] dehydrated and malnourished, both of which are two very common causes for the atrophy that we see on a CT scan." Dr. Lakin said that LRJ showed a body mass index (BMI) of "around 12," which is "far greater than the less than two standard deviations below the mean." According to Dr. Lakin, LRJ "certainly was in a malnourished - - moderate malnutrition category." Dr. Lakin testified that based on her examinations of LRJ, he had no underlying medical condition that would have prevented him from eating or gaining weight.

¶36. In addition to Dr. Lakin's testimony, Nolan testified that LRJ demonstrated hunger, thirst, and dehydration when LRJ arrived at the emergency room on May 1. Smith testified that LRJ was thirsty and dehydrated when she took him to the hospital two months later on July 1. And Burton testified that when he saw LRJ on July 1, LRJ appeared weaker than when he had seen him in May.

¶37. When Burton and Turner interviewed Hampton on July 2, she told them that she was the one responsible for bathing and feeding LRJ and that she was with LRJ "24/7." When investigators questioned Hampton about LRJ's malnourished state, Hampton said that LRJ

11

was "already little" when he came to live with them and that his condition was not her fault. Hampton told the investigators that when she cooked, she gave all of the children plenty to eat, and she said that there was always plenty of food in the house. When the investigators questioned Hampton about the burns on LRJ's legs and showed her pictures of the burns, Hampton said that she never saw any burns on LRJ's legs, and no burns were present on LRJ's legs when she dressed him on July 1 before Smith's arrival later that day. Hampton told the investigators that it had been weeks since she had last given LRJ a full bath. She said that she would clean LRJ with a wash cloth in between baths, as she did with her other children.

¶38.     Based on our review of the record, we find that a jury could reasonably conclude from the evidence presented that Hampton committed felony child abuse by "knowingly or recklessly" starving LRJ of nourishments needed to sustain life and growth. According to her own statements to investigators, Hampton was responsible for feeding LRJ throughout the time that he lived with her and Taylor. Despite Hampton's claim that LRJ was already in a malnourished condition when he came to live with them, evidence was presented from which reasonable minds could conclude that LRJ's malnourishment continued and worsened while under Hampton's care.

¶39.     But while we find that sufficient evidence was presented to support Hampton's conviction for felony starvation of a minor child, we find that the State failed to prove that Hampton intentionally, knowingly, or recklessly caused the burns to LRJ's body.

12

¶40. Dr. Lakin testified to the severity of LRJ's burns and said that the burns appeared to be more than a few days old. But Dr. Lakin did not say how the burns might have occurred or whether they were from one or multiple occurrences. Dr. Lakin did indicate, however, that LRJ's burn wounds were reflective of one injury. And she said only that, "in [her] experience and training, . . . a care giver that would see significant burns would seek care[.]" And in her expert opinion, LRJ was "medically neglected" with regard to his burn wounds. The only other evidence presented were the three photographs submitted by the State showing the burns and Hampton's statement and testimony denying any knowledge of the burns.[4]

¶41. Unlike the evidence surrounding Hampton's felony-starvation count, no evidence was presented from which a jury could reasonably conclude that Hampton intentionally, knowingly, or recklessly caused LRJ's burns, either as a principal or an accomplice.

¶42. The dissent, however, finds that there is enough evidence to sustain Hampton's conviction of felony child abuse under Section 97-5-39(2)(a)(i). According to the dissent, since Hampton failed to seek medical care for LRJ's burn injury and later took the stand at trial and proffered no reasonable hypothesis for how or why LRJ was burned, it is reasonable to infer that Hampton caused the injury or acted in concert with her boyfriend.

¶43. First, while we too are loath to set aside a jury's guilty verdict, we will never hesitate to do so when we find that the evidence is legally insufficient to support the conviction.

---

[4] The State suggested during closing arguments that LRJ's burn injury might have been caused by a hot plate, which Smith testified about noticing in the home during one of her visits.

*Steele v. State*, 544 So. 2d 802, 809 (Miss. 1989); *see also Clayton v. State*, 652 So. 2d 720, 728 (Miss. 1995) (Smith, J., dissenting) (admonishing this Court not to allow its "feelings and emotions" to influence the outcome in cases such as these).

¶44.    Second, that Hampton offered no explanation for how LRJ's burn injury occurred in her household is not proof or evidence that she or anyone else knowingly or recklessly caused LRJ's burn injury.

¶45.    Again, the State's expert testified only that in her expert opinion, LRJ was medically neglected with regard to his burn injury.  Medical neglect of a minor child is governed by Mississippi Code Section 97-5-39(1)(d) (Rev. 2014), which prescribes felony punishment for such conduct.  Under this provision, the intentional, knowing, or reckless deprivation of the necessary "health care or supervision" of a minor child that "results in substantial harm to the child's physical, mental, or emotional health" may result in imprisonment of up to five years.  Miss. Code Ann. § 97-5-39(1)(d) (Rev. 2014).  Violation of a Section 97-5-39(1)(d) constitutes felony child neglect, not felony child abuse.[5]

¶46.    The State only presented evidence from which a jury could reasonably infer that Hampton knew or should have known that LRJ had been severely burned.  The three photographs submitted by the State show burn wounds covering almost the entire right side of LRJ's lower right leg.  The wounds are so obvious that it would be virtually impossible for anyone who saw LRJ's bare legs not to notice the wounds.

_____

[5] Any parent, legal guardian, or other person who knowingly permits the continuing physical or sexual abuse of a child is also guilty of felony child neglect and may be sentenced to up to ten years in prison.  Miss. Code Ann. § 97-5-39(1)(e) (Rev. 2014).

14

¶47. But this same evidence, without more, is insufficient to establish the crime of felony child abuse under Section 97-5-39(2)(a)(i). Section 97-5-39(2)(a)(i), as charged in this case, requires proof that Hampton, "individually or while aiding and abetting and/or acting in concert with [Taylor]" knowingly or recklessly caused LRJ's burns.

¶48. "One who aids and abets another in the commission of a crime is guilty as a principal." *Hughes*, 983 So. 2d at 276 (citing *Rubenstein v. State*, 941 So. 2d 735, 773 n.18 (Miss. 2006)). "[T]o aid and abet in the commission of a felony, one must 'do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime.'" *Vaughn v. State*, 712 So. 2d 721, 724 (Miss. 1988) (internal quotation mark omitted) (quoting *Malone v. State*, 486 So. 2d 360, 363 (Miss. 1986)).

¶49. As with most any crime, "[t]he state may prove the crime (corpus delicti) by circumstantial evidence[.]" *Steele*, 544 So. 2d at 808 (citing *Leflore v. State*, 535 So. 2d 68, 70 (Miss. 1988); *Montgomery v. State*, 515 So. 2d 845, 848 (Miss. 1987); *Westbrook v. State*, 202 Miss. 426, 32 So. 2d 251, 251 (1947)). "[B]ut where the case is based wholly on circumstantial evidence, the state must prove the defendant's guilt beyond a reasonable doubt and to exclusion of every reasonable hypothesis consistent with innocence." *Id.* (citing *Leflore*, 535 So. 2d at 70; *Montgomery*, 515 So. 2d at 848; *Westbrook*, 32 So. 2d at 251). "[W]e have held that a circumstantial evidence case is one in which there is neither an eyewitness nor a confession to the crime." *Stephens v. State*, 911 So. 2d 424, 437 (Miss. 2005) (citing *Mangum v. State*, 762 So. 2d 337, 344 (Miss. 2000)). We reemphasized this standard of proof just recently in *Barton v. State*, 303 So. 3d 698, 703 (Miss. 2020). The

State, of course, bears this burden of proof throughout the case, not the defendant. *Murphy v. State*, 566 So. 2d 1201, 1204 (Miss. 1990) ("[T]hat when in any essential respect the state relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis than that the contention of the state is true, and that throughout the burden of proof is on the state." (emphasis omitted)).

¶50.    In *Steele*, this Court reversed and rendered a capital murder conviction due to insufficient circumstantial proof of felony child abuse. *Steele*, 544 So. 2d at 809. A jury found James Steele guilty of capital murder for the death of a twenty-three-month-old child, Christina Sinclair, resulting from felony child abuse. *Id.* at 803. Evidence showed that the child had suffered severe blunt-force injuries to her head while the child was home alone with Steele. *Id.* The evidence also showed that the child had suffered burns to her ears and to her left buttock, which the child's treating physicians attributed either to a hair dryer or to a floor furnace. *Id.* at 805. Numerous experts testified in the case for both sides, resulting in medical evidence susceptible to different interpretations, one of which was that the child had fallen from her bed and sustained the injuries to her head upon hitting the floor. *Id.* at 805-06.

¶51.    As to the burns, the *Steele* Court agreed that the State had proved that the child was burned by a hair dryer, and that evidence was presented that "the defendant *probably* did it[.]" *Id.* at 809. But according to *Steele*, the fact remained, based on other evidence presented, that the burns could have been inflicted by someone other than the defendant days before to when the child was alone with the defendant. *Id.*

16

¶52. Explaining Mississippi's circumstantial-evidence standard, *Steele* reiterated as follows:

> It is always insufficient where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, *for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth*. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such existence cannot amount to proof, however great the probability may be. (Emphasis added).

*Id.* (internal quotation marks omitted) (quoting *Hester v. State*, 463 So. 2d 1087, 1094 (Miss. 1985)).

¶53. Applying this standard, *Steele* said:

> Accepting the evidence in the light most favorable to the state, including all reasonable, favorable inferences, as we must, the circumstances support the state's hypothesis. The circumstances, however, do not exclude the reasonable hypothesis that Christina's injury was an accident, the exact cause of which remains unknown.

*Id.*

¶54. *Steele* found that, "[t]he problem in this case is that the evidence 'merely establishes some finite probability in favor of' the state's hypothesis." *Id.* (quoting *Hester*, 463 So. 2d at 1094). While the State proved that the child was burned by a hair dryer and presented testimony that the defendant "probably did it," and while the State proved that the child "probably did not sustain her head injury" by simply falling off her bed, the state nonetheless failed to meet its burden in the case. *Id.* "All of the favorable evidence considered, there is no evidence, satisfying the beyond a reasonable doubt and exclusion of every reasonable

17

hypothesis consistent with innocence burden of proof, linking Steele with Christina's injury."

*Id.*

¶55.   *Steele* concluded as follows:

> We are loath to set aside the jury's guilty verdict, but must do so in this case.  The evidence was legally insufficient to establish anything more than a probability of guilt and did not 'invest mere circumstances with the force of truth'. . . .  We simply hold that, on the facts of this case, the state's proof of criminal agency was so deficient that no reasonable hypothetical juror could have found, beyond a reasonable doubt and to exclusion of every reasonable hypothesis consistent with innocence, that Steele killed Christina Sinclair.

*Id.*

¶56.   In contrast, we note *Williams v. State*, 937 So. 2d 35, 43-44 (Miss. Ct. App. 2006), in which the State presented sufficient circumstantial evidence to prove felony child abuse.  In *Williams*, Shakyla Trisby suffered third and second degree burns to over 46 percent of her body while in the care of Dexter Williams on June 30, 2000.  *Id.* at 38.  The burns occurred on Shakyla's feet (including the bottoms), legs, buttocks, and lower back.  *Id.*

¶57.   Williams testified at trial that after Shakyla had soiled her diaper, he ran a bath for her and instructed her to get into the bathtub.  *Id.* at 37.  According to Williams, after he returned to the bathroom from taking the diaper outside, Shakyla was standing in the back of the tub "with her teeth chattering."  *Id.*   Williams removed Shakyla from the tub and called Shakyla's mother, who was out running errands.  *Id.* Her mother immediately came home and took Shakyla to the hospital, where Shakyla died of infection and multiple organ failure after twelve days of extensive medical treatment.  *Id.*

18

¶58. For the state's case, a social worker with DHS who had examined Shakyla and interviewed Williams, testified that if a child younger than two had gotten into a tub on her own and had fallen down, the child would have suffered burns all over her body due to the temperature. *Id.* The social worker further testified that Shakyla had suffered "stocking burns" and that such burns were inconsistent with Williams's version of events. The Court of Appeals noted that "[a] 'stocking burn' is a type of deliberate immersion burn caused by holding a child's feet in hot water." *Id.* at 38 n.1 (quoting Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, Portable Guide: Portable Guides to Investigating Child Abuse Series, Burn Injuries in Child Abuse (June 2001)).

¶59. Shakyla's treating physician testified that there was no evidence of splash marks on Shakyla's body and that the absence of splash marks indicated to him that she did not move around in the water. *Id.* The physician testified that, in his opinion Shakyla's injuries were likely caused by being held in hot water. *Id.*

¶60. The pathologist who performed Shakyla's autopsy, testified as an expert in the field of forensic pathology. *Id.* He too testified that he did not see any evidence of splash burns on Shakyla's body. The pathologist also testified that Shakyla had suffered extensive burns to the bottom of her feet, which indicated to him that Shakyla was not standing in the tub but rather she had been submerged into the tub of hot water. *Id.* The pathologist explained that the surface of a bathtub is cooler than the water; thus, if the feet were touching on the bottom surface, there likely would not be burning on the soles of the feet. *Id.*

¶61. Unlike in *Steele*, on which the defendant in *Williams* relied on appeal, Court of Appeals said that had the State presented sufficient evidence to adequately exclude the defendant's claim that Shakyla's burn injuries were the result of an accident. *Id.* at 44. The Court of Appeals found that the State had proved its case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. *Id.*

¶62. Here, we do not suggest that evidence of how an injury occurred is always necessary to prove felony child abuse. For example, in *Harris v. State*, 123 So. 3d 925 (Miss. Ct. App. 2013), the Court of Appeals affirmed a felony child-abuse conviction involving second-degree burns suffered by a nine-month-old infant to her fingers from an unknown source. Yet a physician in *Harris*, accepted as an expert in the field of pediatric forensic medicine, testified that the burns were not accidental, and in his opinion, the infant was an abused child. *Id.* at 931-32.[6]

¶63. In the case before us, however, Dr. Lakin testified only to the severity of the burns and that the burns appeared to be more than a few days old. And she went only so far as to state that in her professional opinion, a caregiver aware of such burns would seek medical care for the burns.

¶64. That is all that the State's expert provided with regard to LRJ's burn injury. Had Dr. Lakin been able to reasonably conclude in her expert opinion that the burn injury was not accidental, the State no doubt would have asked her.

---

[6] We do not mention *Harris* to suggest that expert testimony is required in every case to prove felony child abuse.

¶65. This, however, was not the case with Hampton's felonious starvation charge. Dr. Lakin provided evidence that excluded the possibility that LRJ's malnourished state was the result of some sort of medical condition. And she and other witnesses provided evidence that his malnourishment continued while in Hampton's care.

¶66. The State made no attempt to exclude the reasonable hypothesis that LRJ's burn injury was the result of an accident possibly due to Hampton's lack of supervision. The evidence shows that there were other children around who would play throughout the house unsupervised. And the State had even alluded to a hotplate located in the kitchen as what might have caused LRJ's burn injury.

¶67. Even though one could reasonably conclude from the evidence presented that Hampton knew about LRJ's injury and failed to seek necessary medical care for it, one cannot infer from this same evidence that because Hampton did not seek medical care for LRJ she must have knowingly or recklessly caused the injury.[7] One may arrive at this conclusion only through conjecture and speculation. And it is legally insufficient to sustain Hampton's conviction under Section 97-5-39(2)(a)(i).

¶68. Accordingly, we reverse and render Hampton's conviction for burning a minor child.

**CONCLUSION**

¶69. Hampton's conviction and sentence of twenty years for felony starvation of a minor child under Section 97-5-39(2)(a)(v) is affirmed. Hampton's conviction and sentence of

---

[7] Nor can it be said based on the evidence that Hampton did something to incite, encourage, or assist another in causing it. *Vaughn*, 712 So. 2d at 724.

21

twenty years for burning a minor child under Section 97-5-39(2)(a)(i) is reversed and rendered.

¶70.   **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. RANDOLPH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.**

**RANDOLPH, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶71.   The majority affirms Kadedria Hampton's conviction for felony child abuse, count two of her indictment. The jury rejected her denial of responsibility as to count two, and Hampton sought acquittal for that crime. The trial court denied her motion for a new trial. Her conviction for count one, a separate charge for child abuse, was based on the same direct and circumstantial evidence, photographs, testimony, including Hampton's disavowal of recorded statements she made the day she was arrested. An examination of all of the evidence adduced supports jury verdicts of guilt on both counts.

¶72.   The majority reverses a jury's determination that Hampton was criminally responsible for the burned legs of the same abused child. To the exclusion of every reasonable hypothesis consistent with innocence, the evidence established that this abused child was in the care, custody, control, and dominion of only two persons: Hampton and the abused child's father, Hampton's live-in boyfriend. The majority opines that "reasonable minds could conclude" sufficient evidence was presented to convict Hampton of child abuse on count two, but it inexplicably opines that facts and reasonable inferences were insufficient to support a conviction on count one. Maj. Op. at ¶ 38.

22

¶73. Jury verdicts should only be disturbed when allowing them to stand would create "an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (Miss. 2017) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). An unconscionable injustice is not identified by the majority, for indeed one does not exist. Hampton received concurrent sentences for the convictions.

¶74. The majority sets forth three principles that guide appellate analysis of a challenge to the sufficiency of the evidence. First, the evidence is viewed "in a light most favorable to the State." *Willis v. State*, 300 So. 3d 999, 1007 (Miss. 2020) (internal quotation mark omitted) (quoting *Lenoir v. State*, 222 So. 3d 273, 279 (Miss. 2017)). Next, the State is entitled to "all favorable inferences reasonably drawn from the facts." *Id.* (citing *Lenoir*, 222 So. 3d at 279). When a helpless, malnourished toddler in the care, custody, and control of only two persons is scarred from unattended severe burn wounds, it is within reason that a jury would infer that one or both of the responsible caregivers were guilty of the crimes charged. We have repeatedly held if any "reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt, this Court will not disturb the verdict." *Id.* (citing *Lenoir*, 222 So. 3d at 279).

¶75. The majority posits pejoratively the opposite, i.e., that no juror could reasonably conclude Hampton burned the child or aided or abetted or acted in concert with the abused child's father in doing so, *see* Maj. Op. ¶ 41, despite the fact that twelve of her peers who sat on the jury and the circuit judge who presided over the case and smelled "the smoke of the battle" concluded otherwise. *Necaise v. Magnolia Pers. Care*, 768 So. 2d 307, 312 (Miss.

Ct. App. 1999) (Southwick, P.J., concurring) (internal quotation mark omitted) (quoting *Gavin v. State*, 473 So. 2d 952, 955 (Miss. 1985)). The law rejects such a dismissive analysis. It is unreasonable for a trier of fact to infer that an abused toddler living in a one-bedroom dwelling suffered severe burns, but never uttered a sound, a cry, or a whimper alerting Hampton to the pain and suffering all mankind knows the child suffered. What unreasonable trier of fact would accept Hampton's denial or that she did not know? *See* Maj. Op. ¶ 18. The majority's nullification of this jury verdict is at odds with our law, the respect due the collective wisdom of jurors, and our duty to defer to juries, and it is wholly detached from the evidence presented, common sense, and sound judgment.

¶76.    The State introduced photographs depicting a malnourished toddler lying on his side. The photos clearly reveal a large area on his legs from slightly above the ankle to the crease behind his knee, with some healing scar tissue, which, according to the medical expert, accompanies second-degree burns and evidenced untreated healing. The physician who treated him verified the photos showed second-degree burns. The physician testified that it was obvious no one had tended to the burns on this child. The photos in evidence confirmed that the child's body was attempting to heal by itself, just as the doctor testified. The evidence adduced revealed that the three-year-old had been burned, that neither Hampton nor her live-in boyfriend treated the burn injuries, and that Hampton denied knowledge of the burn injuries. Life experience teaches that severe pain accompanies second-degree burns. Twelve of Hampton's peers were charged with the responsibility to determine if Hampton

committed, aided and abetted, or acted in concert with another in the burning of this child.[8]

No question exists that the child suffered injury. Hampton's denial of knowledge of any injury to this child defies logic and truth. Would a reasonable juror violate their oath if they concluded that Hampton had lied on the witness stand? Was a reasonable hypothesis advanced by anyone who might have suggested guilt lay with another?

¶77. The testimony adduced reveals that this toddler victim lived in a one-bedroom dwelling with his father, Hampton, and Hampton's three minor children. Two of Hampton's minor children were unrelated to the victim, the other a newborn half sibling. Social workers and police officers alike testified that each of Hampton's children appeared well-nourished

---

[8] Jury instruction C-11 carried this charge:

The Court instructs the jury that the Defendant, Kadedria Hampton, has been charged by indictment with the crime of felonious child abuse.

Under Count One, if you find from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that:

1)      On or about or between May 1, 2015 to July 2, 2015, in Coahoma County, Mississippi

2)      The Defendant, Kadedria Hampton, individually or while aiding and abetting and/or acting in concert with another, that being Ricky Taylor, Sr., did unlawfully, intentionally, knowingly, or recklessly and feloniously burn R.T.J., a minor child, on his legs,

then you shall find the Defendant, Kadedria Hampton, guilty of felonious child abuse in Count One.

If the State has failed to prove any one or more of the above elements beyond a reasonable doubt to the exclusion of every reasonable hypothesis consistent with innocence, then you shall find the Defendant not guilty.

and without injury. The victim was not related to Hampton. Since March 2015, months before this crime was uncovered in July 2015, the victim was in the exclusive care, custody, and control of his natural father and Hampton. Independent witnesses all agreed the victim suffered from malnutrition, dehydration, and severe burns. The only fact in dispute under both charges was whether Hampton's denials were true or false.

¶78.    The day that the victim's burns were documented by photographs, the day his burn wounds were finally tended to and treated, Hampton gave a recorded statement to the Clarksdale Police Department. This incriminating statement was played for the jury. The statement was taken the very same day the victim had to be transferred to Le Bonheur Children's Hospital for essential treatment for (1) starvation, (2) dehydration, and (3) severe burns. Hampton's own words that day informed the jury that she was the primary caregiver for the victim every hour of every day. Hampton stated that she fed the victim every day, clothed the victim every day, and cared for the victim every day, including washing his body. Not until mounting the witness stand at trial did Hampton deny that she was the primary caregiver.

¶79.    On the witness stand Hampton denied knowledge of the burns, stating the victim never complained of pain or any suffering. Common sense dictates any person experiencing burns such as those shown in the photographic evidence would express, voice, or utter pain and suffering. The first jury instruction given exhorted the jury to use their common sense and sound judgment.[9] The jury watched and heard Hampton recant the recorded statement.

---

[9] Jury instruction C-1 included this charge: "You are required and expected to use your good common sense and sound honest judgment in considering and weighing the

On the witness stand she claimed that it was not her but the victim's father who fed, clothed, and bathed all the children, including hers. The jury was not offered excuses, explanations, or a reasonable hypothesis consistent with innocence as to how an abused toddler sustained such horrific injuries in a one-bedroom dwelling without Hampton's knowledge.

¶80. Was it not reasonable for a jury to infer that Hampton would have heard whimpers, cries, or sniffling of an abused child after his being burned? Or would Hampton not have heard the cries of distress while an abused body was attempting to heal itself? Was it reasonable for a juror to infer that her claim that she never heard whimpers or cries from the untreated victim as he was bathed and clothed? Was it reasonable for a juror to infer that an innocent Hampton would have sought treatment and protection for the child? Hampton's defense was to claim a lack of knowledge of injury. Was it reasonable for the jury to infer that, despite numerous contradictions, Hampton either knew or committed the crime or aided and abetted and withheld treatment to conceal the crime?

¶81. The child was tortured. Only Hampton and her boyfriend had access to the child. Neither she nor he did anything to seek medical care for the child. Was it reasonable to infer that since the defendant took the stand and proffered no reasonable hypothesis for how or why the child was burned, that Hampton acted in concert with her boyfriend?

¶82. It is often said that a picture is worth a thousand words. The photos dispel the credibility of Hampton's denial. Before convicting Hampton, the jury received the photographs of the child, along with testimony from medical experts and social workers, and

testimony of each witness who has testified in this case."

27

finally rejected Hampton's incredible testimony that she did not see or hear anything adverse to the child's well-being. The jury heard Hampton's first statement that she was the primary caregiver for the child, and then, at trial, the jury heard Hampton deny that she was. The jury heard Hampton claim total ignorance of the child's malnourished and burned body. Hampton had no obligation to testify, but when she did offer contradictory testimony without explanation, a reasonable jury could infer that her words were not truthful.

¶83. It is well established that "a jury may infer guilty intent when considering the totality of the circumstances." *Thomas v. State*, 277 So. 3d 532, 535 (citing *Ryals v. State*, 305 So. 2d 354, 356 (Miss. 1974)). When determining intent, a jury may consider "acts coupled with surrounding facts and circumstances." *Id.* (citing *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974)). Under the statute, the State had to prove to the jury that either Hampton "intentionally, knowingly, or recklessly" burned the child or that she aided and abetted the one who did. Miss. Code Ann. § 97-5-39(2)(a)(i) (Rev. 2014). Examining the photographs, expert medical testimony, testimony about the child's living situation, and Hampton's statements, alternately claiming and disclaiming responsibility, all the while denying knowledge of any physical injury and suffering of the victim, provides more than sufficient grounds to infer Hampton's culpability for both crimes.

¶84. It is not our province to weigh evidence, testimony, or credibility. *Willis*, 300 So. 3d at 1007 (quoting *Little*, 233 So. 3d at 289). Our role in all cases is to examine the evidence adduced and ask only whether sufficient evidence provided reasonable inferences necessary to convict Hampton. Bearing in mind our deference to juries, *see Roberts v. State Farm Mut.*

*Auto. Ins. Co.*, 567 So. 2d 1193, 1196 (Miss. 1990), I cannot conclude the jury erred. Not only sufficient evidence but ample evidence supported the jury's verdict. After viewing the photographs, listening to medical experts, listening to other testimony, and listening to Hampton's own words, the jury concluded that sufficient evidence supported that Hampton committed this crime also. There is nothing in the record to rule otherwise.

¶85.    For the above reasons I respectfully dissent.

**GRIFFIS, J., JOINS THIS OPINION.**